Case No. 25, Statute 289, Coalition for Humane Immigration Rights, et al. v. Kristi Noem and her official capacity as Secretary of Homeland Security et al. Appellants, Mr. Becker, for the appellants and Ms. Song for the appellants. Good morning, counsel. Mr. Becker, please proceed when you're ready. Good morning, your honors, and may it please the court. Tyler Becker from the Department of Justice, on behalf of Appellants, I'd like to reserve 2 minutes for rebuttal. The district court below entered a universal 705 stay against 3 DHS documents that plaintiffs contend to authorize extradited removal for aliens whose parole has been revoked. Yet, plaintiffs lack standing to seek a 705 stay because their 705 motion did not challenge regulations that allow the very same conduct they allege is harming their members, namely the application of extradited removal to former parolees. Plaintiff's 705 motion thus failed to demonstrate that a 705 stay was likely to redress their alleged injury under Lujan. Even if plaintiffs had standing to bring their 705 motion, it would fail on the merits. Two provisions of the 1996 IRIRA permit extradited removal as parolees whose parole has been terminated. First, former parolees are subject to extradited removal under what is commonly known as the arriving alien provision, a USC 1225B1AI, because former parolees remain arriving aliens once their parole is sent or is revoked. That accords with long standing Supreme Court precedent on the entry fiction, where aliens paroled into the country are viewed as remaining at the border for due process purposes, because parole is not an admission to the United States. In accordance with the parole statute, which makes clear that parole shall not be regarded as an admission, and when the purposes of such parole have been served, the alien shall continue to be dealt with in the same manner as that of any other applicant for admission. Before we go too far down the road on that, can I just take you back to the threshold of the argument? So, one feature of the reversibility argument that I'm not quite getting my mind around here is that typically in a case, standing and regressibility turn on the ultimate relief sought. And here we have an interim stay, so it sort of functions kind of like a preliminary injunction is to keep this in place while the litigation is underway. And are there cases that say that a court is supposed to independently address regressibility slash standing as to the interim relief? Because I know there's cases that say that standing has to be shown as to each type of relief sought. That principle is well established, but usually that has to do with the type of relief that's sought at the end of the day. So, if a plaintiff is seeking both injunctive relief and damages, then the plaintiff has to show standing as to each. I guess what's odd about this case, and I don't know that there's another case like it, and I didn't see one slide in the briefs, is that here, there's no doubt that there's at least, I don't think there's any doubt for our purposes that there would be standing and restability at the end of the day. Because in the complaint, the regulation that you're relying on for regressibility challenge is being challenged. It's just that there's not a request for an interim stay of that regulation. And so what your argument basically says, and I think I'm not sure this is right. Maybe is that we treat that request for interim relief as if it were its own case of controversy for Article 3 purposes as to which an independent standing slash regressibility analysis applies as to that. Do you understand? Yes, your honor. I understand what you're saying. And I think the government has looked for cases on this and we're relying on the cases that say, you have to have standing for each form of relief saw. And here there was a 7 and 5 stay entered, and for whatever reason, the plaintiffs chose not to challenge in district court, and even admitted in district court that the DHS could still use the arriving alien regulations to apply extra removal to the same parolees. And this is again, I think an unusual case, and I think we're, I think that's where that's where we're relying on. I don't have another another case on that. And there's something in 1st principles or something that tells me, because you've got an argument that says, even if there is regressibility, or as I'm hypothesizing, we may not even look to regressibility independently for the interim stay as opposed to relief at the end of the day. There's still a question at the back end as to whether there can be reparable injury for interim stay purposes when there's under your argument, an independent regulatory basis for the same actions. Yes, your honor. I think that's right. And the government would be fine with the court going down that route as well. I mean, I don't think plaintiffs can show that they had any, they were irreparably injured. DHS can still apply the same apply regulations that they didn't challenge in their state. So, here's my question about that. Then it is under your view. You look at it. It's happening either at the front end or at the back end. Either way, the existence of the regulation, the underlying regulation, and the absence of a request on an interim basis for a stay of that regulation means that the state can't be the front. And my question about that is, if there's a practical difference between the extent to which expedited removal is being pursued based on the regulation alone, or based on the regulation, plus the directives that are being challenged and that have been stayed. Then would that under your view mean that you get past the reversibility or back end irreparable injury parts? Because there would be a difference. Some of the directors are doing some work, even if the same actions could be taken under the regulation, they're just, they're just not the directors are doing some work because they're acting as an instruction to officers to act in a particular way. And so, they're, in fact, helping the plaintiffs in some measure. That's not to the exclusion of any arguments you may have on the merits, but just for these purposes on the effect of the lack of an argument that the regulation should be stayed on an interim basis, will that kind of delta matter? Your Honor, here, I think the question under Lujan is, the plaintiffs sought a prospective stay, something that was going to prevent in the future the alleged harm, which was expedited removal to former parolees, and it's entirely speculative what sort of harm that is actually, what sort of harm that's actually going to have by not actually staying the regulations. I mean, it may be that DHS would apply expedited removal less. It could be that they would apply it the same. There's just no evidence in the record as to what DHS would do in the future if the stay was reversed, for example. And what's been the experience? Your Honor, DHS is continuing to apply the expedited removal to former parolees with this using the regulations instead. It has received some pushback from certain district courts. In our reply brief at page 7, note 2, we list some cases where district courts have ruled against DHS on this ground, and right now, DHS is only able to use the arriving alien regulations to do this because the designation, functionally, the designation provision and the expanded designation that occurred at the beginning of the administration has been stayed with respect to parolees. So, we can essentially only use the arriving alien provision, and a lot of district courts are just following what this district court did here in DDC. But when you say you can only use the arriving alien regulation, I thought the way that your arguments are nested, the arriving alien authority gives you everything you need. Why does the designation authority even matter if you have the arriving alien authority? That's correct, Your Honor. It matters to the extent that we're not even able to, as to these particular aliens, we're not even able to argue that they're subject to the designation provision at all when we think they are under the language of that provision because they have not been paroled. So, are you saying that these district courts in footnote 2 have disagreed with you about the arriving provision, and you think you might be able to win with them if you could argue the designation provision? Your Honor, I think that's one thing that we just aren't even able to use this designation authority. You're quite the optimist. They've ruled against you on what's probably your best argument, so it seems maybe optimistic to think they would rule for you on your second best argument. Yes, Your Honor. I think that the issue here is that the other issue, I would say, and that goes to what I think gets at maybe some of the government's irreparable harm, which I think may relate to these standing questions as well, is that right now in the district court, we're technically under a stay order, and the stay order is a little unclear whether it even reaches the arriving alien regulations. It purports to hold the regulations ultra-virus, so it's technically an advisory opinion because the plaintiffs didn't challenge the regulations here. It clearly is the case that it did not stay, vacate, and join officials who are applying the 1997 regulation, because if it did, then you would be committing actions worthy of contempt every time that you apply that. Yes, Your Honor, but as I think you recognize, Your Honor recognized in the concurrence when denying the government stay application in this case, the government has been, since having to use the arriving alien regulations, had to make a decision about whether to actually even use these, given the district court's opinion. You've made the correct decision based on the best reading of the injunction, and then going back to some of the earlier questions, I'm curious too, you know, there was, I guess, a certain amount of applying expedited removal to parolees before the, probably even before the March guidance, before the March document. There's probably some amount of it before, and this is brief, I'm not just like pulling this from the news, but before the directive went out to hit a 3,000 person a day quota, there was probably some amount going on after the district court's stay in this case, and probably some amount going on still today. And I am curious, like, roughly, what are the numbers there, because I'm curious whether the stay has slowed down considerably the pace that expedited removal was before the stay being applied to parolees. Well, your honor, I don't have any particular numbers to offer you on this point, and I will say one of the reasons I think that's important is here, the question is, what would happen if the district court's stay was actually reversed? And I think that what plaintiffs are saying is that they think that some of their injury actually is being redressed by the stay, and by having the stay in place. And we just don't think that's the case, given that in the future, plaintiffs have no evidence as to what the Department of Homeland Security would do if the stay was reversed. If you were doing this to 1,000 people a day before the district court's stay, and then that dropped to 5 people a day for the past month since the district court's stay, that would be some reason to think that a stay can redress the injury. But on the other hand, if you were doing 1,000 a day before the stay, and you continue to do 1,000 a day after the day, that would be some strong evidence, I think, for you that this stay is not checking the redressability box that standing requires. Your Honor, I think that it would be proper to look at that, but I think it's also important to take a look at what standing under Lujan actually requires. The plaintiffs need to show that their injury would likely be redressed. And maybe there's some evidence, and whether there's some evidence or not, as to if there was less expedite removal under the arriving alien regulations, it does suggest that there's no evidence in the record as to what DHS would do in the case that there was no stay. Do you have an answer for what is the evidence about what has been happening during the stay compared to the week before the stay? I do not, Your Honor. And I'll note that I think some of the plaintiff's claims about arrest quotas and the like, this has to do with other things that have nothing to do with the stay or with expedited removal for parolees at all. So I'm not really sure that specific numbers would actually help in this regard. It would be entirely speculative. What if the plaintiffs, and I know your position is that it's the plaintiff's burden, but I'm just hypothesizing. Suppose the plaintiffs introduced evidence or an affidavit or something that said the pace of expedited removals has slowed considerably since the stay. Then at that point, would you say that your addressability argument and your irreparably argument on this floor at the back end don't work because the pace has considerably slowed since the stay? Well, Your Honor, I think the issue here is that where we're looking at standing is technically from looking at when the complaint was filed, or in this case when the stay was filed. So I'm not sure that evidence, well, the government is under a court order to not apply expedited removal. And that actually says the arriving alien regulations are ultra vires, that that would be enough evidence to suggest the plaintiffs actually have standing. Because then it would be that plaintiffs would be able to put that. Does that mean that no matter what, that there's no way in a case like this in which, because I mean, I guess the plaintiffs could forecast before the fact, before the stay was entered, they could forecast that the pace of expedited removal would go down significantly if the request to stay were entered. But is that what you're saying had to have been, suppose that had been done? Yeah, I think that would be a different situation. I think here we have plaintiffs admitting that you could just apply the same regulation. It's different to say that you can apply it and then to say how often it's applied. I mean, I think nobody disagrees. I mean, we can ask the plaintiffs. I don't think anybody disagrees. It sounds like that the regulation can be applied and it would result in some expedited removals. I think the case, and it has, apparently you've represented that it has, and I haven't seen a dispute about that. But I think the question would be, is there a reason to think that it's just not happening as often? For example, if you have a directive that just tells officers you have to do this, and then they're under an order from a supervisor or a directive to do it, whereas if that directive is no longer in place, then maybe they just don't have the same hydraulic pressure and institutional dynamic that brings this about. Well, Your Honor, that's where I go to some of these, and some of these are in a different context. But I think the best case on this is Dock Society from this court, where there was a situation where visa officers or people that were investigating these applications, there was a mandatory policy that the State Department created in 2019. There were regulations that allowed visa officials to consider in individual interviews whether those applicants, what those applicants' social media handles and would ask for them. But the mandatory policy plaintiffs were alleging actually made them go and reduce their speech as a result. But I think the difference there is, and you're right to point to that case, because there's the mandatory and then the idea that the panel, on which the panel rested its decision, is that there's still discretionary authority. And as long as there's still discretionary authority, then the plaintiffs still have an issue. And so there wasn't anything that the plaintiffs had submitted explaining why the existence, the remaining existence of the discretionary authority wouldn't have had the same effect. But I think the difference is that in that case, the injury that was being claimed is that, look, as long as there's any authority at all, we're not going to try for this because we're worried about our social media stuff being laid bare. And so it didn't matter if it was mandatory or discretionary because the existence of it in any measure, whether discretionary or mandatory, would have discouraged the plaintiffs from doing the thing that was at issue. So it seems to me that it could be a little different here because if here the injury is the actual prospect of expedited removal and there's a practical difference between that likelihood when the directives are in effect and when they're not, notwithstanding the existence of the underlying regulatory authority, then it seems like that's a delta. Now, I mean, I understand your point that that's something that needed to have been done, and you would say it needed to have been done before the fact, and it just wasn't. But the prospect of that delta would be a reason that your redressability-slash-reparable injury argument can't work. Your Honor, then I'd probably go to the—I'd probably add just to that that some of the—I think this is—they're in a slightly different context, and there aren't many cases in this even like this, frankly. So the government is extrapolating from some of those. They're the cases that I think plaintiffs criticize the government for as being involving third parties, that actions of third parties would need to occur in order to determine whether there was actually redressability. And I think that those cases are really helpful in this context because they get at that there's just really no way to know exactly what DHS would do absent the stay. So, for example, in National Wrestling Coaches Association, there was—plaintiffs didn't challenge a regulation that allowed—that essentially allowed the same conduct that later guidance and policy interpretations allowed. And while that depended on what schools would actually do with wrestling programs that related to gender and Title IX, it didn't actually—as a result of not challenging the regulations, it was just entirely speculative what the schools would do and whether they would—whether changing the interpretations or vacating these documents that are there would actually redress the plaintiff's injury, which was losing these high school wrestlers. Okay. So you're taking from those cases that kind of speculation rationale that says that unless there's some concrete indication that there would be a differential, it becomes speculative. The third-party cases indicate that, even if this is not a third party. Yes, Your Honor. We can see this is not a third-party case. It's just that we just don't think there's a lot of other cases like this, and we're— Just one more question just to go back to something you talked about earlier, which I'm not quite understanding, which is you've made the representation in your briefing that there are expedited removals going on right now under the arriving end regulation. That's correct, Your Honor. Right. But then you've made the representation that it's unclear whether the district courts stay has an effect on your ability to use that regulation. Your Honor, the district court stay here does say that the regulation is ultra-virus. Now, the government has relied on Halon v. Burkine, which is a Supreme Court decision that says that redressability depends on—not on the opinion, but what's in the opinion, but on the actual relief. And the relief did not vacate that regulation. Now, the district court stay, we do not believe, actually vacates the regulation. It's from 1997. We don't think even that there would be—that we think there would be a jurisdictional time bar to even challenging it in this type of proceeding. But ultimately, the district court did purport to say that the regulation was ultra-virus and that— Your Honor, so what I'm understanding is—I think I understand everything you've said, except what I don't get is if you reach the conclusion, at least in some instances, that notwithstanding the district court's opinion and its language about the rule of regulation being ultra-virus, which you think its only language actually doesn't stop you, and in fact, the government has used the regulation to effect expedited removal as to parolees, then why is that just not the government's practice writ large? Why is there—why would there be any concern about the district court's language if, in fact, the government is using the regulation in some instances? Why doesn't the government just think, all right, well, we can use the regulation in any instance? Well, Your Honor, the district court did purport to rule that this regulation was ultra-virus and that it didn't apply to these parolees that are here. Obviously, that could lead to—the government is obviously worried about it hasn't happened, lead to contempt proceedings or other things because the district court's opinion does include that language. But are all the ones where the regulation has been used, did they predate the district court's day? They did not, no. Right, so that's what I'm not getting. If there are—I think I'm just missing something basic, and you can just tell me what I'm missing. If, since the stay, the government has relied on the regulation to effect expedited removal of parolees, then the government has clearly reached the conclusion that the language in the stay opinion doesn't foreclose that, and I understand that. If that's true, then I guess I'm just not understanding why the stay would have any effect on the government and the opinion accompanying the stay would have any effect on the government's use of the regulation to effect expedited removal. Well, Your Honor, I think the reason that it is having an effect on the government is mostly from the fact that district courts are using the district court's opinion and saying that the district court hears opinion and saying that that opinion applies to, in the E.D. case I think that we cite in reply brief note 7, the plaintiffs there are challenging the government and saying that the government violated the stay in that case, in this case, and that's happening throughout the country. And so that means it's just having the same effect as if the district court judge had written a law review article. That's correct. So, I mean, we think this is ultimately an advisory opinion, and that's one of the dangerous things. Why do you have standing to appeal? Your Honor, I think that I definitely thought through this question given the make the road panels Carson factors that I think the court has said apply here. And I think that it has to do with the fact, with two reasons. First of all, that district courts around the country are considering and there are claims against the government that the government is violating the stay and can't apply expedited removal until you slam into a law review article. So that can't be right. And secondly, the government is subject to potential contempt proceedings in district court as a result of the stay. I mean, the government seems to be making a per se argument that all 705 stays are immediately appealable. But that's not what we said in, is that argument open to us after the make the road stay decision, which applied the Carson factors? Well, Your Honor, I think the make the road stay decision applied the Carson factors. I don't think that the stay decision is a published binding decision on the court. However, we do think that we need it here given the two things I just just mentioned. What is the best argument that all 705 stays are immediately appealable? Well, Your Honor, any 705… Is there a case that's saying that or what's your best textual argument? Well, Your Honor, the 705 stay is very similar to a preliminary injunction. It's because of you have to find irreparable harm. You have to find likelihood of success. And it would be it would be passing strange if you could not appeal a something that is functionally an injunction that is preventing the government from vacating certain documents. They're not vacating, staying certain documents and not allowing them to have… As to that, is there any difference at that level between what you just said and what the make the road panel, the state panel decided? Because I think the same argument was before the make the road panel and it didn't find that persuasive, right? I think the make the road panel focused on whether it focused on what harm there was potentially to the government. And it assumed that if the government was successful on the merits that the government would have… Well, I ask this question because I think here… I think here it is harder perhaps for the government to meet the Carson factors. So perhaps you can speak to why you meet the Carson factors in this case where you're continuing to enforce the arriving in regulation even after the stay. Yes, Your Honor. So, I think that… So, the Carson factors… Under the Carson factors, there has to be… There's a practical effects test and it allows that it can only… That stay can only… Any sort of thing that's not… That's like a prologue under 1291. Only if it might have a serious, perhaps irreparable consequence and can be effectively challenged only after immediate appeal. Now, here… The government needs that. Here, assuming the government prevails on the merits, the government has been subjected to a court order purporting to bar nationwide the use of expedited removal to parolees, including alleging or finding that the expedited… That the arriving alien regulations are ultra-virous when the district court did not even have jurisdiction to do so. So, it entered an advisory opinion. And at the end of the… And the government is essentially saying it was an advisory opinion, so we're continuing to do expedited removal. So, what's the serious harm under the Carson factors? Well, Your Honor… Government's own, you know, representation that is continuing to perpetuate this policy. Well, Your Honor, I think that's a good question. But I think here the problem is that we still have these other district courts that are treating this order like a binding or nationwide injunction against applying expedited removal using the arriving alien regulations and using these documents. So, the government's position is we have appellate jurisdiction here because district courts elsewhere are misreading our district court stay order? Your Honor, I think that's one of… Is that your best argument, serious harm? I think that our best argument is that currently in district court, we are subject to a stay of these documents. We are not allowed to rely on those documents. We cannot rely on the designation provision at all because we can't rely on the expanded designation that occurred earlier in the administration. And as a result, we are…we're hampered in what sources of authority we can rely on. And obviously, if a district court finds…if we only apply the arriving alien regulations to apply expedited removal to an alien and we're not allowed…end up not being allowed to do that, we haven't been able to apply the designation provision. Can I just ask on that just to reconfirm? But it's adjacent to what Judge Ratt was just asking about. On the designation one, I just want to ask it again. Am I right that the designation one doesn't matter if you've got authority under the arriving alien regulation? As to these particular plaintiffs, that is true. Plaintiffs have only in their complaint alleged…brought a complaint on behalf of parolees who were…who entered at…who were granted parole at a border…port of entry as opposed to somebody who has, for example, entered illegally and then was granted parole later. So, for this case, the inability…the hypothesized inability to use the designation authority just doesn't matter if you have authority under the arriving alien regulation? Well, yeah. And the arriving alien regulation also allows the government to use it beyond the 2-year continuous presence period. That's why…I mean, it's the big circle and the designation one is within the big circle. That's correct, Your Honor. And the issue here, I think, is that we're just not able to rely on the designation provision at all. But, again, like we could rely…before, we could rely on both authorities. And I think plaintiffs make some APA arguments about this, about how it's unclear, you know, what authority we're relying under and the like. But, ultimately, we were able to rely on both authorities. And to the extent the government was self-limiting itself to only applying it for the past few years, obviously, it has two sources of authority that it thinks are proper there, whereas it doesn't otherwise.  Okay. Just out of curiosity, what if you copy and pasted the three guidance documents, the three challenge documents, and, you know, sent them out tomorrow? The same documents have been stayed by the district court, so I assume there would probably be proceedings about whether we were complying with the stay order. But, again, this gets to whether guidance… Well, it's not a rejunction. It's a stay of the previous action. So, I don't think a stay or even a vacatur of something in the past would stop you from doing it today. Well, Your Honor, this gets a little bit more complicated here because part of the documents that are being challenged here are also at issue in the Make a Road case. And the issue is that even if we—we would have to do basically an entire redesignation. We would have to expand designation again to being up to the two-year statute. Think about standing—both the standing of the plaintiffs in the district court and your standing to appeal. So, for the purposes of this question, just pretend like the Make the Road case doesn't exist, which… In any event, what could you do, Mike? Could you do what I'm hypothesizing? Could you just redo, copy and paste these three documents, send them out, perhaps the district court would stay them the next day, you copy and paste, send them out the next day, on and again and again and again? Your Honor, the documents here, I mean, yes, I suppose you could do that, yes. Okay. I mean, I think that again makes it—I mean, makes it even harder to kind of grasp what your standing on appeal is, but I'll let that go. Do we really even need guidance documents to do what the guidance documents do? Well, Your Honor, I think that's the government's— Enforcement discretion. Enforcement discretion can be—I mean, you don't have to write down how enforcement discretion is going to be applied. Yes, Your Honor, I think that's right. And that's, I think, one of the problems in this case is that the plaintiff's challenged enforcement documents. I mean, one of them is an email with the one that actually applies the—or is, you know, using the arriving alien authority is actually just an email to staff members. And— Is that your best argument about redressability? The document is— are basically enforcement discretion documents? I mean, yes, Your Honor, I think that that actually is a good argument for—as to why there's no redressability here, because ultimately all you can do is—all the plaintiffs have done is challenged these enforcement discretion documents. There's old regulations from 1997 that they may not even be able to challenge in this type of proceeding here. And there may be no sort of—and as—because there's—DHS can just choose to enforce those documents as it—choose to enforce the regulations. Whether it was doing so in the past or now doesn't really matter. If they can choose to do so, that, I think, is the reason that there's no redressability here. You focused on all these other third-party cases and all these other things, but I was wondering. Yeah, Your Honor, I think that the reason for that is because there's—there's just—this is a very odd situation where the plaintiffs below admitted that DHS could just use the same regulations, and the district court specifically considered this—our redressability arguments below and found against the government and said that there was redressability because some of their harm could be—would be ameliorated by a stay, although we just never understood what exactly that harm was that could be redressed or that part of their harm. I have some merits questions, but I don't want to change the topic if you have no understanding. So, I'm a little unsure what your position is for a parolee who has been paroled his entire time and has been paroled for, let's say, three years. I understand that if that person is still on parole, then expediting removal is okay. But let's say that that parole was lifted today. Can that person be put in expedited removal tomorrow? Your Honor, under the arriving alien regulations, yes. Okay. And so, I mean, that just does—and then let's say that they were paroled for a day upon arrival, and then that parole was lifted, and, you know, they've been in the United States for 20 years. Your position is that they are still arriving so they can be put in expedited removal? Your Honor, are you saying that they were illegally entered the United States 20 years ago, and they were given parole yesterday? No. They were given parole on day one, and then it was lifted on day two, and they've been in the United States for 20 years since then. I think under the text of the current arriving alien regulations, that would be the case, but I don't know that DHS would actually use this discretion to do so. And while the expedited removal statute, if you read it, says shall, BIA precedent that we cite in our brief gives the ability to apply expedited removal a discretionary authority. Part of this case might depend on whether that 1997 arriving alien regulation is properly interpreting the statute. And you seem on really solid ground with, including because of a lot of the precedents going back 100 or so years, that, you know, if you're on parole, you are arriving, you're entering, we treat you as if you have been detained at the border. But I don't see any of those precedents saying that, you know, if you were detained for a day or paroled for a day, and then running around the country out of parole for 20 years, that you're still considered an arriving alien. Well, Your Honor, at that point, somebody would have been able to, if parole was canceled, maybe they saw a different type of status. I mean, if they had been in the country that long, I think that that's probably what would have put them there. They've been living in the shadows. But I will say. That person is arriving, living in the shadows for 20 years, but not on parole. Your Honor, I think that here the alien would likely have sought another status. But I will say, I think the Make the Road Stay panel, two of the judges on that panel, had some language about parolees. And parolees enter on the condition and with the understanding that they remain legally at the border. Any connections they make with the United States are with knowledge of their unentered status. People that come in on parole. Maybe they were. But were they talking about people on parole or people whose parole was 20 years ago? Your Honor, I don't think that was considered there because I think the issue there was that in the due process context, it doesn't matter how long somebody has been here. They still only get. If you came in on parole, you only have gotten, even if it's, I think the Kaplan v. Todd case is one that's why I think it's eight or nine years. There's no additional process than whatever. Let's say someone paroled for a day, then released, and let's say 10 years after that somehow got a legal status. I guess you would say that person is no longer an arriving alien. Yes, Your Honor. If you have a legal status, you would not be subject to exit on removal. Can you get parole before you show up at the port of entry? Your Honor, it cannot be granted until you're at the port of entry formally, but they can issue you something that allows you to come to the border to do so. So that was what was going on with the CBP-1 app. One of the reasons that this is even going on, that there's so many parolees, is that under the parole programs that existed during the Biden administration, there were, I mean, a million plus people that came in under these parole programs. There was a mobile app that was created in order to try to have less folks coming in, trying to come in through the southern border. People were able to, frankly, fly into ports of entry and get approval to do so and use this app in order to put in their information and the like and to schedule appointments to be granted parole at a port of entry. So I was trying to adapt Judge Walker's hypothetical scenario, but what about, and it sounds like it can't be done with respect to somebody getting parole before they show up at the border because that doesn't happen. You only get the grant of parole when you get to the port of entry. That's how I understand it. So suppose you have a situation in which a person is paroled, comes into the country, and then leaves and then comes back but isn't paroled a second time. Then would the arriving regulation apply? Your Honor, I'm not sure on that precise scenario. I think that given, usually parole is only for one entry, it's an entry into the country. So I think at that point they may be subject, they may be just a regular alien that would be subject under the designation provision if they were caught within a couple of years. So that person wouldn't be subject to expedited removal. If they're paroled, they come, they leave, they come back the next day, not on parole status that time, and then they're here for 15 years. And they could come back unlawfully through the border? Yeah, in that case, the person, I think the person would be in a different, would likely be in a different category. Now, if they're in the system, it might be difficult because they were in the parole system as to make their own state panel. I think recognize, like, this parole system is very comprehensive. Like, you would be able to look up the person, and they may be seen as somebody who was on parole at the time. But it would depend on what knowledge there was about their status. I think that, again, if they were here for two years, if they were not able to prove to the officer that they were not here for two years, for the prior two years, I think they would be subject to expedited removal. Under the designation. Under the designation. Are you just talking about the arriving regulation? Yeah, Your Honor, and one thing about the arriving alien regulation that I think this gets at is whatever the scope of the term arriving alien means, I mean, if somebody has been paroled, or if somebody has been in the country for a year unlawfully and then is paroled into the, paroled into the interior or whatever, while they're awaiting their removal proceedings, that person would, that person would probably only, would not qualify under the arriving alien provision. They would qualify under the designation provision to be subject to expedited removal if their parole was canceled, or if their parole was canceled during those prior two years. And that's because the regulation speaks strictly, speaks about the parole? The regulations, the arriving alien regulation specifically speaks to arriving aliens as being granted, as Iranians arriving in a port of entry. I'm not saying that the statute couldn't be read broader than that. It's just the regulation for a long time has stated, has stated that.  Attempting to come into the United States at a port of entry. Got it. Okay. Yeah, and that's why I think why we, our interpretation of the arriving alien regulation is, or the arriving alien person of the statute is partly what it is, because the person goes back to that situation under the parole statute, which is somebody who was arriving into the United States on a port of entry. Mr. Becker, can I ask you about the government's argument that a 705 stay has to be limited by traditional equitable principles? If we were to agree with that, would that principle also apply to a vacator under 706? Does it have to? Your Honor, the government's position on that is that it would apply to a vacator under 706, but we don't think it necessarily has to, because the language specifically in 705, 705 clearly incorporates traditional, traditional equitable principles. For example, the language of 705 is saying that to prevent irreparable injury, a court may issue all necessary and appropriate process to stay administrative action or preserve status and rights. And we think this is very similar language to that the Supreme Court considered in the Starbucks case, where the court was saying, said that similar language about necessary and appropriate just invokes traditional equitable principles. And so it would be a coherent reading of the APA to apply those traditional equitable principles under 705, and then perhaps reach a different conclusion under 706. Your Honor, we think that the government thinks that 705 very clearly invokes traditional equitable principles, and we have also taken the position that 706 should also be limited in the scope of the plea. But you said that the language is different in the two provisions. That's correct, Your Honor. The same words, the many words, I think, in 705 that basically refer to traditional equitable principles are not present in 706. Yes, Your Honor, this is not a 706 case, but we are, and the government has maintained its position as to 706. But as to 705, we think the language is pretty clear under Supreme Court precedent. It invokes traditional equitable principles, and we think one of those principles is CASA's principle, the complete relief principle. Is your position on the arriving provision consistent with your position on the designation provision? And here's why I'm asking. I think for the arriving position, you say arriving equals paroled, and that can mean paroled even if just paroled in the past as a historical fact and no longer if. But for the designation provision, I think you mean paroled or does not equal, does not equal paroled just in the past. Paroled means having the current status of being paroled. Aren't those inconsistent? Your Honor, we think the language here is different. So under the designation provision, the language has not been admitted or paroled. So that present perfect tense, we think here means that the provision is looking at whether the person is not subject to expedited removal. Because it's under the designation provision, which is a broader provision. It applies to a bigger group of aliens than arriving aliens. For example, it would apply to parolees who were granted parole not at a port of entry. They came in illegally and then were paroled pending their removal proceedings. Yeah. But for the designation provision, you think paroled means currently paroled. Is that right? Has not been paroled means that they're not currently paroled. They're not, yeah, that they're not paroled currently. For the arriving provision, you think that arriving means currently paroled or not currently paroled, but paroled in the past? Yes, Your Honor. Those, so this is a little bit different because we're talking about people who were granted parole at ports of entry, I think. Whereas the designation provision, I think, encompasses both those groups. So under the arriving alien provision, someone that's granted parole at a port of entry doesn't enter with any sort of expectation, any sort of expectations that they're able to stay in the United States. And certainly not after their period of parole has expired or that it's been terminated. So if I'm understanding your question, I think the issue here is that some people may be subject to both provisions and some people may not be, depending on… It's not so much that. It's more of just sort of like a grammar textualism concern. For the designation provision, you think paroled means past or present. And for the arriving, you think paroled means, I'm sorry, for designation, you think paroled requires present. But for arriving, you think paroled can mean past or present. That may be right, Your Honor. But I also take a look at, I think it's a full language in the designation provision. The provision has not been paroled. And I think that that is a different text. I mean, I think that you could say, I think if the designation provision said something like was paroled, that might suggest that in the past, that parole in the past would prevent you from being subject to… We have a past tense verb like was, not a present tense. Correct, Your Honor. Ending like ing, as in arriving, which sounds pretty present. And you want that to mean was in the past once paroled. Your Honor, that's why I think the term arriving alien is important to consider separately here. Because it just is dealing with an entirely different issue, which is whether somebody, I mean, the entry fiction is always complicated. Because you're trying to think about what position somebody would go, somebody maintains their position at the border. They're an arriving alien, no matter whether they've been paroled or whether they've… I'm not averse to it, but like even fiction books end. You might be right about this, Your Honor. But we think that nonetheless, that both provisions would allow us to subject these aliens to respite removal. I have one final question on something that's a little bit down in the weeds, but I just want to make sure I understand what happened.  In the CHNV designation, the one in the Federal Register. Yes. So there's a question about arbitrariness and capriciousness and all that. I'm not trying to get down in the weeds of this, but I'm just trying to understand what was intended here. So there's a critical language in the middle column that you're undoubtedly aware of. And it says, to effectuate the prompt removal, the U.S. government may, at its discretion, initiate expedited removal proceedings where appropriate. Expedited removal is available only when an alien has not been continuously present for at least two years. The two years preceding the date of the inadmissibility nation and then citing the statute and the regulations that deal with the designation part. So I understand that's part of your argument that there's no inconsistency there because that has to do with the designation part, not the arriving part. But then what I'm not following is the next sentence. The next sentence says, if DHS were to allow the CHNV parolee population to remain for the full duration of their two-year parole, DHS would be compelled to place a greater proportion of this population in Section 240 removal proceedings to effectuate the removal. So that just doesn't seem true if you think that you have the authority that you say you do under the arriving regulation. Your Honor, I think maybe DHS, I think here, I see with the word compelled. I think that what is going on here is that DHS is only applying expedited removal to the folks from the prior two years under the designation provision. The arriving alien regulation is broader authority. And I think that my best explanation for it is that this is really based on what the statute allows. And they could have been applying it under the arriving alien and just regulation and just were not. DHS is not compelled. It says that DHS would be compelled to place a greater proportion in Section 240 removal proceedings. But if you've got the – if DHS has the authority under the arriving regulation, then it wouldn't be compelled because it could use the arriving regulation. Unless I'm misreading this. That may be right, Your Honor. I think under our argument now, our argument is that they could use the arriving alien regulation for people whose parole was revoked. I think that – or for people whose parole was revoked and I guess even people who were still on parole. The relevant population is the CHNB parolee population to remain for the full duration of their two-year parole. So what DHS appears to be saying in this registered notice is that if DHS allowed those folks to stay for the full two years, then they'd be compelled to use something other than expedited removal. They'd have to use 240 removal. But as I understand your argument, that's actually not true because the arriving regulation would still give the authority, even for somebody who's here for the full two years. It would still give DHS the authority to use expedited removal as to that population. Your Honor, under the arriving alien regulation, DHS would be able to use that as to that population because that population – that population would be former parolees. They're people who would – the CHNB only allowed granting parole at – they wouldn't – you wouldn't have been able to get. My understanding is that under those programs, you actually wouldn't have been able to get that type of parole if you had been in the country and entered illegally. So I think that's correct.  So, okay. So I just want to make sure that this says would be compelled, but actually under your position in the case, DHS wouldn't be compelled. It's not necessarily saying there's a legal claim that arises. Yes, Your Honor. I just want to make sure I understand. Yes, Your Honor. Our position is that these individuals would be subject to expedited removal even beyond the two-year period. I think two questions. One is a follow-up on that, and one is a follow-up to something earlier. The follow-up on this is, let's say that I look at this sentence that the Chief Judge is describing, and I think it was probably meant to talk about what the designation provision allows and doesn't allow. But it is inaccurate as written because it says that something is compelled, which the arriving in provision allows. Let me know if you're following. Yes, Your Honor. I'm following. Okay. Then what is your opinion about what our court in this posture should do about that? Well, Your Honor, I think it's a lot of plaintiff's arbitrary and capricious arguments that relate to these two different authorities, sort of myths that—I think they're basically arguments about what the statute and the regulations allow. I think there's other places in the CH&V termination notice that specifically reference the arriving alien regulation. I'm looking at 13612. In the absence of any subsequent application conferring an immigration benefit or status, and upon termination of parole, such alien remains an arriving alien and goes back to that status. So I think that while this notice may not specifically state the authority to use extant removal as to those folks, it does state that they would be arriving aliens and they would be subject to extant removal, even beyond that. Whether DHS was going to do that or not or would do that, I think, is a different question. And I think that there's subsequent guidance that specifically states that the arriving alien— Right. And if I say I agree with all that, I think I didn't quite get the answer to my question. What are we supposed to do? If there's something here that's inaccurate, it conflicts with other accurate sentences that you've been referring to, what do—I mean, your answer can be we should do nothing, but I'm just wondering what— I think Your Honor, as to that provision, I don't think plaintiffs have really alleged any sort of harm from that as a result of not being— I think the theory is that maybe because of some Supreme Court precedents, the government needed to address reliance, plaintiff's reliance. Part of how they addressed plaintiff's reliance was saying, well, we, the government, have an interest in moving fast. So far, so good. Our interest in moving fast is this sentence. Well, if this sentence is legally incorrect, then I think the plaintiffs would argue that weakens your explanation for why you needed to move fast at the expense of their reliance. And again, I'm not saying this means we should affirm the stay. I'm just wondering why not. Well, Your Honor, I think it's probably appropriate for the court to clarify that there is the ability to remove aliens under the Arriving Alien Regulation. I just don't think that DHS was necessarily relying on that before. I think plaintiffs make a lot of claims about that. I think your argument sounds like we should affirm the stay in spite of the sentence that Chief Justice was reading because even if it is inaccurate about what is compelled, it's harmless error. I think that's right, Your Honor. I don't think that this affected— Maybe this is about what you're going to say if I let you finish your sentence, but why is it harmless error? Your Honor, this is harmless error here because the plaintiffs go—the plaintiffs are not alleging any particular harm from DHS limiting itself to that couple of year period. They're not alleging that—this is not a case about the parole termination notice and whether that was appropriate at all. I think that they're alleging that their harm here is from having expedited removal applied to former parolees. And I don't think that—I think that this isn't a challenge to the notice generally on why the parole programs are being terminated. I think this is just a different case, so it's harmless error as to this case, certainly. Okay. I'm just going to change topics, but if you can follow up. Yeah, I'm also not—and then you just wanted an interjection quickly because I'm—when we ask the plaintiffs, I don't—I'm not recalling— I could be off about this, but I'm not recalling that either the plaintiffs or the district court isolated this particular sentence as opposed to the previous sentence, which I think was doing most of the work for the arbitration. So that may be part of it, too. There's a question as to whether this one was put into play, but I just wanted to make sure that I understood what the government's position was on this given the apparent language. I'm grateful for the clarification because I had underlined both of those sentences. So I think, hopefully, for your sake, you need your answer about the sentence I asked about and the sentence the Chief Justice asked about to also be the right answer of the sentence. Do you see where we are? It's 13-619 of the Federal Register. The middle column. The set of sentences that have been kind of the focus of the—at least one of the focuses of the arbitration capricious argument, that paragraph that begins, the DHS has concluded the Central Alliance interests, and then he sentences down a couple sentences from that. Oh, yes. Sorry, I have to click on 71. To effectuate their prompt removal, the U.S. government may in discretion initiate expedited removal proceedings where appropriate. Right, and then the sentence, the one I think that Judge Walker and I are focused on, the sentence after that, which is, if DHS were to allow the CHNB parolee population to remain, that sentence where the second clause of DHS would be compelled to place a greater proportion of this population in Section 240 removal proceedings. Just to tweak that clarification, Mr. Bender, the sentence that the Chief Justice just read that begins, if DHS, but then there's one sentence right before that that begins expedited removal. Yeah, I think the district court was focused on—if I remember right, it was focused on that first sentence. But I—yeah, because the district court was saying that we were citing the incorrect—the two documents cited two different legal authorities, because the—and I think that was the focus of what the district court was getting at, was that there was—that the termination notice was essentially not citing the correct—not citing the arriving alien authority, but the email, the enforcement email was citing the arriving alien authority and noting that it could be available for—if there was no time on that. Yeah, I thought the point was that the—this sentence that Judge Walker has helpfully highlighted, expedited removal is available only when an alien has not been continuously present in the U.S. for at least the two years preceding. That was the subject of the arbitrary and capricious conclusion on the theory that this says only has not been continuously present for at least the two years, but then there's other documents that say there's no time to mention. And your response to that was, well, this has to do with the designation authority, and those other documents have to do with something as to which there's, in fact, no temporal limitation, because that's the arriving authority as to which there isn't. And that—I understand that argument. I guess I was focusing then on the sentence that follows it. And on that one, I'm not—I think you're acknowledging that that sentence is not fully accurate in saying that DHS would be compelled. And then there's the question of whether that matters. Yeah, I think that's right, Your Honor. I think that under the arriving alien authority, they would—under our position in this case, they would be able to apply expedited removal. And one more time, why does it not matter that this sentence is wrong? Your Honor, Plinkus here are not challenging the—I don't think are really challenging the reliance interest, that we didn't consider reliance interest in actually terminating the removal, terminating the CH&P programs. I think what their argument is is that it was—that between these couple of documents, it's just not clear what legal authority we're relying upon. Maybe. Okay. I'm going to—J.D., you have more questions? Okay. Let's go back to the merits a little bit and less the reasonably explained argument. Let's say that—well, do you have an argument that at first I found appealing, and now after I thought about it a little more, I wasn't as persuasive? I still want to tell you what the argument is. If you want to persuade about it, you can tell me why you think I'm wrong. And then it might affect what remedy you would be entitled to. You have a line in your brief that says, the 1997 regulation has not been challenged. So we take it as correct. And, of course, it hasn't been challenged because it can't be challenged 60 days in the past. Because the 1997 provision can't be challenged, these three guidance documents can't be challenged for applying the 1997 regulation. And so even if the 1997 regulations were unlawful, there still should be no stay in this case. Because the three documents challenged were—which argument the following thing might be a metaphor for, but I'll let it go. The three documents can't be challenged because they rely on a regulation to be challenged. Here's where I think that's probably wrong. Imagine the 1997 document had said something that was completely unconstitutional. You know, it says the government can run around summarily, you know, taking people's property whenever it wants to. And then, okay, that document can't be challenged because of the 60-day time limit. But then now, in 2025, the government issues three documents that instruct government officials to go around summarily taking people's property. And they say, we're doing it in reliance on the 1997. I think those current 2025 documents would be instructing government officials to do something illegal. Something that the 1997 regulation said the government could do. But because the 1997 regulation was wrong, these current documents are instructing the government to do something illegal. And since it's within 60 days to challenge these 2025-year documents, they could be challenged and ought to be stayed and eventually vacated if they are telling the government to do something that the Constitution either prohibits or that a statute does not authorize. So, am I right? I think I'm right about that. And if you think I'm wrong, tell me why. Your Honor, I think those, I think in that case, if they're arguing there's some sort of unconstitutional violation, there may be some sort of ulterior motive. Let's say that the 1997 regulation says a statute allows us to do this thing. But the statute doesn't allow it. And so in 2025, the government issues three documents telling government officials, go do this thing that in 1997 we said a statute allows. But there is no authority for the government to do this thing in 2025 because no statute allows it. Well, Your Honor, I think that under 1252E3, which is, I think, which is what plaintiffs are bringing their challenge under, it's a facial challenge to these documents. I don't think that prohibits aliens from raising in their individual expedited removal proceedings that the document is unlawful. So, I don't think this is the situation where we actually have that issue where you just could never raise this challenge. And I'll say that these reports are, as I think we've described, considering challenges to the arriving alien regulation and whether it's appropriately as applied to these aliens. This is, I think, something that comes up a lot in this court with regulations. For example, SEC regulations you have to challenge within 60 days and the like. And the question is, after a certain amount of time, after those 60 days, what do you do about that? If those regulations were totally unconstitutional, you would be able to do individual proceedings. I get that these plaintiffs could not ask us to stay or vacate the 1997 regulation. That couldn't be clearer. But they can ask us to stay the 2025 documents. And if those 2025 documents tell government officials to do something illegal, I think a court is supposed to stay that, right? If those documents are simply applying the 1997 regulation, I mean, I think that under our position in this case, because if the 1997 regulation says the same thing as those documents, and I think that's what you're getting at, Your Honor. Is that correct, that the 1997 regulation is totally unconstitutional? If the 1997 regulation is totally unconstitutional and these documents are just simply applying that regulation, I think that really the only relief plaintiffs could get is by going into their individual proceedings and alleging that these are unconstitutional. I don't think that this isn't a case where there would not be any sort of judicial review for such a thing. I think this just happens in many other contexts as well. It's just that you end up bringing it in an as-applied context rather than in a facial challenge. I thought the government's position, though, is that even in an as-applied challenge, the time bar would apply because it's a statute of repose. I mean, that was the government's position to make the road. Your position now is that the 60-day time bar, Dan, doesn't apply in individualized proceedings? Well, Your Honor, what I'm saying is that I think under a lot of what district courts have been doing, they've been considering whether these aliens are subject to expedited removal in their individual proceedings. Is that permissible under every rule? I don't think so, but I think plaintiffs would have to bring an individual case in D.C. to challenge those. You said that there would be judicial review available for an as-applied challenge even if the 60-day time bar had run. You said this is a situation where judicial review is available. Not that district courts are saying it's available. You're saying that it is available. So I'm just wondering if the government changed its position on what the mandate of statute of repose means. I don't think the government has changed its position. I think that in that type of situation, I think that aliens would have to bring some sort of ultraviolence or some sort of other mandamus action or something of that nature. There may just not be available regular judicial review. I'm pretty confused. Go ahead. Sorry. Then we're back to what Judge Walker asked, which is then the government's position is that even if the underlying regulation is patently unlawful, we just stipulate to that. And then the directives applying that regulation to individuals even just can't be challenged. Those individuals would have to challenge that in their individual removal proceedings. And that's really the only way. Is that consistent with the circuit's opinion in MMV about the 60-day statute of repose? I mean, consistent with MMV, I don't know that the alien would be able to bring. I mean, the alien certainly couldn't bring a facial challenge to these regulations. Very little in alien in expedited removal was allowed to argue. That's correct.  I don't think this is one of those things. Again, I think they would have to bring some sort of, I mean, they could try. If it was a totally unconstitutional regulation, they would have to bring some sort of ultraviolence action or something of that nature. And then this is totally not. And what would the cause of action going to be? No, I'm saying is I don't think they would have a cause of action to bring it. Okay. So there wouldn't be judicial review? Yes, I think that's right. I'm just going to disagree. I think that if the 1997 regulation said you can apply expedited removal to, for example, someone lawfully here on a student visa, I think, and then if a 2025 document says start putting people on student visas in expedited removal, that the 2025 document could, within 60 days, be challenged according to the cause of action here, and a court could stay in and vacate it. You don't have to agree or disagree with that. I'm just, that's what I think. And then if that's correct and you can't totally rely on 1997 to absolve, totally absolve yourself of the merits here, then you might still win on the merits if the 1997 regulation is correct. Because here's where I very much agree with you. I think if the 1997 regulation is correct, you haven't done anything illegal in these 2025-3 documents. Because all they're doing is just applying what you said you were going to do in 1997. So that then raises the question, was 1997 regulation correct? And it does seem to me like it was correct. Because I'm not sure that someone who's no longer on parole and has been here longer than two years can be subject to expedited removal. I know you disagree. We already talked about why you disagree. And you might be right. But if you're wrong and I'm right, what do you think this panel and this posture on your appeal from this day should do? Assuming that I'm correct and there's a sliver of people out there that you are saying you have the authority to apply expedited review to who you don't. And those are people no longer on parole who have been here longer than two years. What should we do? Your Honor, I don't think there's anything to do in that I would just reverse this day. Because the plaintiffs challenged the 1997 regulation in their complaint. And the case could be sent back to district court and that could be litigated there. But you, in my, what I'm asking you to assume, the three challenge documents are telling government officials to do something that it is illegal for them to tell government officials to do. And that would be put into expedited removal people who are no longer on parole and who have been here for longer than three years. And I'm asking you to assume that that is unlawful and that there is a cause of action that would allow plaintiffs to get a court to stay that and vacate that part of it. And now I'm asking you, in that assumption, what do you think we should do? Well, if there is a cause of action, and I guess there is standing here to challenge that, I mean, in that case, then I think that would raise what the meaning of arriving alien is in the statute, which I do think is raised in this case. So the court would have to interpret what arriving alien meant in the statute. And I think that that is raised by the documents themselves. But the issue here is that plaintiffs didn't challenge the regulation. That includes a definition that I think encompasses people who are here for longer than the time period here. And let's say that I think, okay, based on the merits, I think I'm just going to vacate, I'm going to uphold the stay. And you say, no, no, no, even if I think what I think about the merits, I should still not totally uphold the stay. I should only uphold part of the stay because. Your Honor, I think in that case, I mean, I think the vast majority of people who this would be applying to, given this case is mostly about the CHMD parole programs, I don't even know that the kind of outer bounds of what arriving alien would qualify as is even really raised in this case. So it's possible that none of the people that I'm concerned about need this stay. I don't think that plaintiffs have alleged any individual member that has been here for that long that needs to be, that somehow needs to stay or has been here for 10 years. I don't think, I don't think that's what the focus of the case is on. It's on the cancellation of these termination programs, these parole programs, and whether those folks can be subject to expedited removal. Maybe when it's the plaintiff's turn, they can say that they disagree with that last thing that you said. Yes, Your Honor. Make sure my colleagues don't have additional questions at this point. Okay. Thank you, Your Honor. Okay. Yeah. I'm shorter.  Good morning, Your Honors, and may it please the Court. Esther Song for the plaintiffs. Congress established the expedited removal system in 1996 for people who arrive at our borders and who have entered illegally and have no entry documents. Now, those aren't actually my words. Those are the words the United States government offered to the Supreme Court in their opening statement in United States v. Syracuse. And the plaintiffs here today simply agree with that plain text interpretation of the statute. It's the plaintiff's position that that plain language of the statute, the structure, the legislative history all make clear that the expedited removal authority applies only to two distinct and limited populations. First of all, people who are arriving in the United States without proper documentation. And second, people who have come to the country illegally, of course, subject to the designation of the Secretary of Homeland Security. But people who have come to the country illegally and who have been here physically present in the country for no more than two years. And parolees, people who have come to a port of entry, who have been inspected, and who have been paroled into the country, do not fit in either of those two populations. Before we go down the road on the merits, can we just talk a little bit about these threshold questions, about the implications of the fact that for the interim state purposes, as opposed to at the end of the day, you haven't sought to stay the regulation. It's just the government's position, obviously, is that if you haven't sought to stay the regulation, in fact, the complainant presumes that the regulation allows expedited removal, then how can you show redressability or how can you avert an inability to show irreparable injury if there's still authority to effect expedited removal as to this very population under the regulation? Sure. The government does want to direct the court's attention to the regulation, and because of that, I think the import of this appeal is not what it once was. It was actually filed a motion for summary judgment in the district court that encompasses our claims relating to the regulation, and that's currently pending. The government moved the district court to hold that motion in abeyance pending the disposition of this appeal. We opposed that, and the district court indicated that she wanted to wait to rule on that motion to hold our summary judgment motion in abeyance. Right. I mean, because it was your choice whether to seek a stay of the regulation as part of the interim stay application, and you opted not to, and it could be for all kinds of reasons, including there's a time limit issue, obviously. But for whatever reason, what we have before us is an interim stay only of the directives but not of a regulation that your complaint itself assumes can be used to effect expedited removal. So where does that leave us with redressability or irreparable injury? Well, where that leaves us is the question is sort of whether the district court properly found that there was redressability as to the challenged actions with the record that the district court had before it at that time. The district court and, frankly, the plaintiffs could not have predicted that the government would, in fact, change its position as to the regulation because the record before the district court was very clear that— And, Your Honor, Judge Srinivasan, you pointed this out. There is a difference between the extent to which expedited removal was being pursued based on just the regulation and the regulation plus the directives. And the record is very clear that when we were in a world where it was just the regulation, the government was not, in fact, pursuing expedited removal of essentially humanitarian parolees, people who had been paroled at a port of entry and inspected and paroled into the country. The record before the district court was that there were only two instances of individuals being paroled into the country. I'm familiar with that record. Sorry, just one follow-up. And I guess what I'm wondering about that is let's just stipulate that that's a historical record, and that is definitely what the district court relied on to say that redressability had been shown. But this just gets, I think, to the question of enforcement priorities. If the regulation hadn't been used, but it could be used, which I think your complaint presupposes, in a broader set of instances than it had been used, and then there's a new administration that just has different enforcement priorities and wants to max out on the use of the regulation, then the fact that there's been an uptick after the directives, would it be altogether surprising? Because that's a reflection of the enforcement priorities having shifted and an increased emphasis on using the regulation. And if that's the case, then I don't know that the right baseline is just what was the case beforehand, because what was the case beforehand was predicated on a different set of assumptions about the aggressiveness of the exercise of enforcement authority than might be the case now. And so then one would say, well, if the regulation still could be used to the same extent as the regulation plus the directives, the fact that it wasn't being used to that extent at a prior period wouldn't necessarily tell us if it still would be used now to that extent. Right. And if the burden – you're right that we have to address whether the district court – to affirm the district court's conclusion as to addressability, but the burden is on the plaintiffs to show addressability, so what we have to address is whether the district court correctly concluded that the addressability had been shown based on what you put in the record. And I guess on that set of assumptions, then why is there something in the record from which to conclude that given what the state of affairs is now with respect to enforcement priorities, we would expect that there would be a meaningful delta between what exists under a regime in which there's just a regulation and one in which there's the regulation plus the directives? Well, I think first – I have a couple of responses to that. First, the district court found as a factual matter that the defendants had failed to rebut evidence from the plaintiffs that the underlying regulation would have been used – would have had the same result if the challenged actions hadn't issued. And I think probably as a practical matter, although I can't presume on the part of the government, to the extent that there were changing enforcement priorities, the challenge directives, like, effectuated that, implemented that, and they are challengeable under 1252E3. But I also think that this gets to sort of the speculation argument, right, that you were discussing with my colleague here. And I think that this situation is a little bit different than some of the third-party cases, for example, and the nuclear regulatory case that the government cites, because you do have a very clear track record of sort of with the regulation and with the regulation with the directives. And the district court did not err in finding that staying the directives would have some effect. And, in fact, it did. And you can tell this from the positions that the government took in its briefing before the district court. The district court—excuse me, the government said in opposing the motion for stay that the relief that we requested would prevent DHS from applying expedited removal to potentially hundreds of thousands of paroled aliens. And, of course, now they're taking a different position. They have changed position here. But that doesn't mean that the district court was wrong in finding legitimacy on the record that the court had in front of it or that the district court's stay doesn't have any meaning or import. And I think it's actually very similar to the terrorist case that the Supreme Court just decided in which, as you know, the president turned around the very next day after the Supreme Court's decision in learning resources and reimposed basically the exact same terrorism based on a different legal authority, but something that the president had always telegraphed that he was going to do if the original terrorists were ruled unlawful or unconstitutional. And in that instance, I don't think anybody would argue that the plaintiffs who challenged the original terrorists and learning resources and the related cases didn't have standing. But they might have a claim as to that. They might have an argument as to their use of authority. And I think what makes this case different or at least complicated is that your complaint itself presumes that the regulation could be used to effect expedited removal. So let's suppose that we just agree, just for purposes of this question, that there's a downtick because of the stay of the directives. But do you dispute that the regulation on its own could be used to the same extent? No, I don't dispute. But the point is that the stay did have that effect. And that is why the district court didn't err in finding with, again, with the record before it at that time, that there was redressability and that a stay of the challenge directive would have, would redress part of the plaintiffs' injuries. I just, I mean, when the question is, you know, ramping up or ramping down enforcement discretion, it's very hard to say that, like, like, if there is underlying legal authority, which you accept that the regulation provides legal authority for this. How, I mean, how can we say that the stay itself is, like, affecting whether there are more or, you know, fewer or more people put into expedited removal? I mean, it's a matter of discretion. It is, but enforcement discretion, as you can imagine, is a huge enterprise. It has many moving parts. And I think. Which is exactly why it's hard to show redressability from a single stay when the underlying legal authority persists. But I don't think that's correct. The record shows that when you just have the regulation and all the immigration enforcement officers in the country can, again, exercise discretion, as they will, the record is very clear that when that was the state of affairs, there were only two instances, at least. There were different enforcement priorities in previous administrations. I mean, this administration has made very clear what its enforcement priorities are, whether there is a document that says it or not. Yeah, challenged actions here are just statements of administration policy of how discretion will be exercised. Yes, but I think the point is enforcement. Enforcement discretion to be communicated and implemented in some way as a practical matter. I mean, enforcement officers can't define this from. Telepathy or something like that, and so that's what the challenge directives represent. They can represent. Of the new enforcement priorities by the administration, and they communicate to to enforcement officers. You have this, but how is that? I mean, how does that establish for address ability? Well, I think the district court. I don't think that the district court aired and certainly the, the, the government hasn't disputed or shown any error in the district court finding that the, it was a challenged actions. The challenge agency actions that are the cause of the harm to to the, to the plaintiff's member independent error that the district court made by suggesting that the burden is on the government. Well, the burden is on the plaintiff to show address ability. The burden isn't on the government. Yes, and well, the record that we submitted that was not disputed by the government. I think that's maybe where the district court language is coming from. But the record that both parties developed before the court is very clear that. After the challenge agency actions were issued and implemented, that is the cause of the harm to to the, to the plaintiff's members. There's a very clear before and after picture, I think, in the record. And so, as a result, I don't think that it was abuse and abuse of discretion for the district court to conclude that staying the challenged actions would at least in part redress the plaintiff's harm. And I think what we have here, frankly, is a little bit of whack a mole right there. What we thought we were dealing with was sort of 3 directives that were causing harm to to the plaintiff's members. And so we flagged all 3. And that was a litigation error. And that also raised the regulations for the stay, right? So that's not something that we can fix. But we've watched those 3. But then I point out that, again, it's a change in position that the government is now taking that it can rely on the regulation independent of the challenge agency directives to apply expedited removal to parolees. And so the mole is popping up in the 4th hole, but the district court, again, did not err in whacking the mole as it were. The plaintiffs agree that there is the 4th mole. And you agree that it's there. You just chose not to whack it down in the stay. I mean, that's not the government's fault. I mean, you agree that the regulation allows this type of action. And so I don't mean to belabor the metaphor too much, but there wasn't a mole popping out of the 4th hole at the time that we moved for the stay from the district court. And it's sort of a 20-20 hindsight thing, but at the time when, you know, the directive from the administration was to ramp up to 3,000 apprehensions per day, et cetera, it seemed very clear at that time that what was driving this, what was causing the harm to the plaintiffs' members, was the 3 challenge agency directives. That was what needed immediate effort. I mean, this is sort of a problem, though, with litigation attempting to use federal courts to control enforcement discretion. Because say the secretary just announced, didn't write it down, just said, well, okay, you know, I direct people to, you know, enforce the, you know, use the 1997 regulation for greater enforcement of expedited removal. But even plaintiffs view that would be permissible. But Congress did make these types of written policy directives challengeable under 1252E3. I think precisely because expedited removal is a very draconian enforcement action. It's very stripped down. There's no process. And so there is review available under 1252E3, and we've brought the suit in a timely fashion. And what was causing the harm to the plaintiffs' members, again, at that time, was the challenge agency directive. And I would point out that after the—unfortunately, it's not in the joint appendix. It's in the record below at ECF 53. There was sort of an interim period during which the district court had issued its stay, but this court had not yet denied the stay pending appeal request from the government. And in that sort of interim period, we did bring the government's attention to an individual parolee who had been placed in expedited removal. And we suggested that this wasn't appropriate in light of the district court stay. And the next day, the government wrote back to us and said, this person has been taken out of expedited removal and has been placed in regular removal proceedings. Perhaps what they would now call over-compliance of the stay is evident against them? Well, I think it's an indication that they understood that the stay had effect and that it did redress the plaintiffs' harms. I mean, that's the question of sort of what record did the district court have before it? What was causing the plaintiffs' harms and what would redress the plaintiffs' harms, at least in part? If I—if you filed the stay on what day? I think it was June 11th. And are you saying that you didn't know that—you didn't know at that time that the 1997 regulation— No, that's not what we're saying. But what we're saying is that, again— It was—the 1997 regulation was injuring your clients at that time, correct? I suppose—yes. But the point is— I think you would have to say yes because you amended your complaint that day to challenge the 1987 regulations. You can't— Yes. Challenge a regulation that you don't have standing to challenge. No, I understand that. Yes. But, again, I think here, for purposes of redressability, is that the relief doesn't have to address all of the plaintiffs' injury. It just has to redress part of it. I think you said that, too. And I know the district court said that. And it makes sense if, you know, if you've suffered a million dollars in damages and you can get 10,000 of those, that's redressability. Part of your injury has been redressed. But I would think, like, being put in expedited removal is sort of a binary thing. You're either in it or you're not. So I'm not sure how you could get partial redress when your injury is being put in expedited removal. It's partial redress in that the government was clearly relying on the challenge agency actions to subject people to expedited removal. What we want to do, like what the end goal of this litigation is, right, is to remove all the sources of authority that the government is relying on to say that parolees can be subject to expedited removal because— That may be what you want to do at the end, but that's not what you try to do in this day. This is true, but that's because, again, back in June of 2025, the world was, as we understood it, was sort of regulation, essentially de minimis application of expedited removal to parolees. Regulation plus directives, a huge explosion in— I mean, if the regulation was only causing de minimis injury, I'm not sure why you amended your complaint to challenge it. Well, it's still injury, and then again, what the government—the government has now changed position and is saying, oh, well, now that the challenge agency directives have been taken off the table by the district court's order, we can still rely on the regulation. But that is not the position that they were taking before we filed the lawsuit and before we moved for the preliminary relief from the district court. In addition to that, I know that—I'm not asking for a name because I take it some of the members, if not all of the members of your organization are proceeding under anonymous names, with that in mind, I'm asking for a name. Can you identify someone who has been put in expedited removal who would not have been put in expedited removal absent the, I guess—I guess, actually, no. Someone who has not been put in expedited removal but would if this stay is lifted. Well, certainly the declarations from the organizational plaintiffs talk about and identify some members who have—who express harm, who have expressed fear of being subject to expedited removal. And again, all of the consequent problems that attend that, they're afraid to leave their house, you know, all of that. Again, I mean, I think that—I don't doubt that the fear is real and that the fear is important. I'm wondering, as a matter of redressability, under the third prong of standing, it's your burden to show a likelihood of redressability. So I think you need to show at least a 51 percent likelihood that this stay is the reason that at least one person has not been put into expedited removal. Who is that one person? Obviously, I think that, again, it goes back to what the state of affairs was at the time when we moved for relief and when the district court, again, with the record that it had in front of it, what the district court assessed to be redressable. And because the challenge agency actions are what was driving this increase in pursuit of expedited removal against parolees, certainly following the district court stay, everybody breathes a sigh of relief. Because this very obvious source of authority that the government had been relying on to subject parolees to expedited removal had been stayed. I get all that, but I do think, like, you haven't come close to identifying the pseudonym of the person I'm asking for. Certainly, we can look it up in the declarations. If you'd like to, we can submit something to the court to identify these people. There are definitely people identified in the declarations of the plaintiff organizations who have parole, CHNV parole, or CBP1 parole, and who are concerned, especially because of- You don't have to prove to me that they're concerned. I think that has been established. If you want to make a filing, that's your prerogative. I'm not asking for it. I guess we would also consider whether it's too late at this point because the burden was on you to do it before now. But what you would need to show is not that someone has a fear. You would need to show a likelihood that the stay is the reason that that person has not been put into expedited removal. And that if the stay were lifted, there's at least a likelihood that that person would be put into expedited removal. And I think in your defense, it's not your fault that you haven't shown it. I think there's a pretty good chance that it just can't be shown. That would mean you don't have stance. I think that part of this is due, in fact, to the shifting position that the government has taken. It's really only after this court denied the motion for stay attending appeal that they then started saying, you know what, don't worry about it. We can rely on the regulation. I think this is what- The underlying state of the legal world is not a shifting position. The regulation was always there. And plaintiffs agree that the regulation can subject these folks to expedited removal. I mean, this idea that there's a difference of degree there, I couldn't find any case suggesting that redressability in part can be satisfied, where there's like a matter of degree and discretionary government action. Can you point to any case where that's the situation? Because your suggestion is if, well, 100 people would do expedited removal under the stay, that number is something less than 100, which redresses some group harm in part. Well, but questions of degree, I'm not aware of any case where we've suggested that. I mean, I think Judge Walker said if it's $1 million and it's $10,000, well, that makes sense. You're getting some of what you're seeking. But it's a matter of enforcement, discretion, it's a matter of degree. How does that establish redressability? Well, I think the, again, the- Maybe plaintiffs made a mistake in not changing the reg for the stay. That doesn't count. That's not a matter of the government shifting position. I don't know why people are mad at that. Well, I think that it is. I think that what causes fear in the plaintiffs' members and what actually prompted the apprehension of some of the plaintiffs' members and placement and expedited removal was the challenged agency actions and not the regulation. And, again, the record is clear sort of what happens when you just have the regulation and what you have when you have regulation plus two with challenged agency actions. And I think that I don't have a case for you on sort of scale, but certainly this court has held that if the district court's account of the evidence is plausible in light of the record viewed in its entirety, then it should not be reversed on appeal. And that's what the district court had in front of it. The district court could not have predicted that following its stay, following this court's denial of the motion for stay pending appeal, that the government would then begin relying actively on the regulation to subject parolees to expedited removal. But you agree that they can't. Yes, but the record shows that they didn't. The record shows that they didn't. As a matter of discretion, not as a matter of law, as a matter of discretion. Yes, but I think that this is what Judge Walker was getting at when he was discussing document society with my colleague here. It's a question of whether, certainly the authority was always there, but again, looking at the chilling effect, I guess, in that case of sort of the enforcement on doc society and I guess with their members and so on. I mean, it's again, the record is very clear that sort of harm coming from just enforcement of the regulation, again, de minimis, harm coming from enforcement. Okay, so that's the only answer. Can I ask you this question? If suppose, and you'll resist this understandably you would, but suppose that the reason that the stay gets overturned, but the reason it gets overturned is that there was no request for a stay of the regulation. And that created a gap, either for redressability purposes or for irreparable injury purposes. And that means that the stay can't be sustained. If it goes back down, would you immediately then ask for an interim stay, but then tack on that you're seeking an interim stay based also on the regulation? Well, we do have a motion for summary judgment already pending before the district court that does encompass our claims relating to both the challenge agency actions and the regulation. And so we have essentially teed up. But that's going to take some time to unwind and be resolved. And I guess the question is, and maybe your answer is, it's not going to take that much time. So, an interim stay just doesn't matter. But if that's true, then, you know, straight anyway. And so the question is, I just asked me a practical question. Would there then immediately just be, depending on, of course, how the district court reacts to it, but would there immediately be a request for an interim stay? But this time tacking on that you're also seeking to stay the regulation while the litigation unfolds. And then the district court would have before it whether that that kind of stay was warranted in light of whatever we would say. Right. I think we'd have to assess sort of a matter of person power. But if I had all the resources in the world, yes, I think we would to prevent parolees from being subjected to expedited removal unlawfully in violation of the statute. And then can I ask you this other question, which is. At least for me, the notion of applying redressability just as to interim relief is a new animal. It may be right. It may be. And I haven't understood you to actually resist that proposition. Because I think both parties are operating on the understanding that redressability needs independently to be shown as to interim relief. That may as well be the case. And it seems like both parties are in alignment on that. But we still have to do our own thinking about that. But I'm not sure practically how much it matters at the end of the day. Because it then surfaces at the back end in terms of irreparable injury anyway. And I guess my question is, as to irreparable injury, apart from redressability, if the authority still exists, regardless of the directives, the authority still exists because of the regulation. Then can you show irreparable injury given that there's still at least a possibility that the regulation could be visited on your clients based on something that's not being challenged for purposes of the interim study? Yeah. I mean, I think it's a practical matter. First of all, the record does show, and this is going to get back into my discussion with Judge Rao, I'm afraid. But that there are people who are plaintiff's members who are subjected to expedited removal pursuant to the challenge agency actions when they shouldn't have been. And if they hadn't been subjected to expedited removal, they would have continued in their normal Section 240 removal proceedings. They would have been with their family. They would have had access to all those things. I think I understand all that. And I guess it seems to me then your position is, and this may be, this is totally fine, this may be your position, is that there's no difference in what you would need to show either to establish redressability or to establish irreparable injury. Either way, it's going to turn on whether, for purposes of the interim stay. Either way, it's going to turn on whether the world in the absence of the stay of the directives would look the same as the world if the directives remain in place. Notwithstanding the existence of the regulation, there's no difference between irreparable injury at the back end and redressability at the front. Well, so if we could, if the government were forced to articulate the grounds that it was relying on to place someone in expedited removal, perhaps we would have a difference here. But, of course, they don't state that. They haven't taken a position when we've asked them the basis for putting someone in expedited removal. But... Maybe I'm not understanding that. I thought the basis for placing parolees in expedited removal is all the merits of the case. Well, what I mean is, based on our understanding, speaking to plaintiff's members, and again, the record showing that the government wasn't attempting to subject parolees to expedited removal before when it was just the regulations.  Right. It's our understanding that people who were caught up in the courthouse sweeps and the nationwide blitz, as it were, and being subjected to expedited removal last summer, essentially, that was pursuant to the challenge agency directives. And then it's our understanding that following this court's stay and this court's denial of the stay pending appeal request, they started relying on the regulation instead. And I do think this gets to sort of the whack-a-mole and the partial retrospectability of, like, what we are ultimately trying to do is to remove all of the sources of authority that the government might rely upon to subject parolees to expedited removal. And the district court's order has taken care of three, essentially, and we're moving now, especially because the government has changed its position on how to enforce and implement the regulation on the fourth. And that's in the motion for summary and judgment pending before the district court. If we were to just affirm, say it was a single sentence. I would say, great, thank you very much, Robert. No, you don't like that. Would you seek a stay in the district court of the 1997 regulation? That's a good question. We did contemplate that, but we figured, especially because it's sort of—we did contemplate that. But what we decided was sort of the most efficient avenue was to move for summary and judgment. Just to key it all up for the district court, we have an evidentiary record that we've put before the district court. And, again, thinking about sort of human resources and how much time things take, we just figured moving for summary and judgment would probably be the most effective and efficient use of our— If the district court said to you, I'll give you a stay of the 1997 regulation without briefing, if you want it, what would you say then? Oh, I mean, sure, we would take that, too. But I think that's probably—I would probably be honest. I'm not saying these are realistic, but I'm asking because I think you would take—I think you would take the stay. Why would you take the stay? To, again, whack the fourth mole, I guess, as it were. Now, you're not going to like this as much, but I think that shows that you need to stay the 1997 regulation in order to redress the injury that this stay is supposed to redress. Well, I think this gets into probably—like, the reason why we're having issues with this is because we don't know, and I think there were various questions about this to the government, sort of, is there a delta, right? Has there been a change in how often expedited removal is being applied to parolees? And we're not in a position to assess that, and certainly if there are questions about that, I suppose that this court could remand to send the case back down to the district court and let the parties hash that out there. And maybe that is the best avenue to get these questions answered because we certainly—we don't have the information that the federal court does. For our motion for summary judgment, we certainly do have declarations from private practitioners who are representing individuals who've been placed in expedited removal who say, my client has been placed into expedited removal following all of the litigation around the district court's stay and this court's denial of a stay pending appeal. And yet, notwithstanding the district court's stay of the challenged agency actions, my person is being put into expedited removal. And that's the record—that's all we have access to, right? Which is why you would want the stay of the 1997— And what we have shown, yes. Which is also why it may be the case that the stay on appeal is not a precedent to enter. I think you've answered my question. Well, I just want to point out, I think that it's a little bit tough because I wonder if we had moved on all four, again, when it seemed pretty clear that the government was not relying on the regulation last summer, I mean, would we have an issue of being able to point to which of the three different challenged agency directives or the regulation was ultimately responsible for a particular person being put in expedited removal? That the day you filed the stay, the government was injuring you with the 1997 regulation. Yes, this is—yes, as a technical matter, yes. But— I guess I assume your position is that if in the world that includes the directives, there's a mandate to use expedited removal, so there's 100% likelihood that expedited removal will be visited on your clients. But in a world without it that exists with the regulation, there's still a possibility, but it's 1%, because the government decides it's going to expend its resources elsewhere in the absence of— or at least the immigration officers decide they're going to expend their resources elsewhere in the absence of the directives. Then, yes, there's still the possibility. Yes, it still causes injury. But it's what you—the bulk of the concern has to do with 100% likelihood as opposed to the 1% likelihood, which you might have thought was zero. But actually, your complaint indicates you at least think that there's some possibility under the regulation. But that delta would be enough. Whether that's true, whether—as long as it's discretionary, the delta could make a difference, I think, is a question of law. But I think your position is that, you know, we would be dealing with the big enchilada, and then we would still like to deal with what's left, too. But for purposes of regressibility and irreparable injury, it still gives us something meaningful to take out the certainty, even if there's still a remote possibility. And I'm obviously loading into it what the delta might or might not be. It may be nothing, but it may be something. Yes, that's correct. I think that the record before the district court shows that there was a delta. And at the very least, the district court didn't err or abuse its discretion in finding that there was a delta to support a finding of regressibility. It may not be abuse of discretion, but it might be legally insufficient for regressibility, which would be, per se, abuse of discretion. I think that it's regressibility, especially in this circumstance, it is a question of fact, but also a question of, excuse me, a question of law, but also a question of fact. And the facts before the court at that time, first of all, are not what they are here before this court. And also, the point is that the facts before the district court at that time supported the district court's conclusion. I think we at least have to accept this proposition, though. If, as a matter of law, the rule were that any possibility that the same consequence could befall your clients is enough to mean no regressibility, then you can't prevail. Because you acknowledge that there should be some possibility under the regulation standing alone. Yes, I think that's correct, but I think that any possibility. And you've offered no, I mean, even assuming the district court's findings are correct. I mean, there obviously has been a delta, even if we assumed it was attributable to the directive. You haven't given, you haven't provided a legal reason why a delta that's based on enforcement discretion would satisfy regressibility. And I know we've already gone around, but I mean, but you keep going back to the facts, but you haven't provided anything as to a legal reason why that would constitute regressibility. No, we can certainly look, and if we find anything, I'll say that in preparing for this argument, the factual record is just so stark that we didn't really have. So, yes. I can address the merits if you would like to, Your Honors. I don't know if you have questions about that. Or questions about it? I have a question about the characterization of the merits, just so I understand it. So, there's the two sources of authority that the government's bringing to bear here, the designation one and the arriving one. Yes. Is it right, do you agree with the understanding that if, and you'll resist the premise, but if the government has authority under the arriving source, then as for purposes of this case, because the plaintiff's class consists of individuals who got parole at the port of entry, then the designation authority doesn't matter? Well, I think that this is the legal oddity that the district court identified, which is that if you accept the government's interpretation of the statute, then people who came to the port of entry and who were inspected and paroled and followed all the rules are forever subject to parole because they are forever considered to be arriving. And then the language in the designation provision that exempts people from having been, first of all, the language that exempts people who have been paroled from being subject to a designation under the designation provision basically has no meaning. But then in addition to that, it means that people who enter the country unlawfully and who come here and are able to evade detection and apprehension for two years are then forever insulated from expedited removal. And that puts the two populations, that treats them very differently. And the government's response to that, of course, is that, yes, for purposes of expedited removal, there's that seeming discrepancy. And I agree with you that that seems anomalous. But then there's other consequences that attend unlawful, coming here unlawfully and staying here that don't apply to someone who gets parole. And so there's just a question of whether that all washes out. Because, I mean, I'm under, I think, with respect to whether the government's position is what you say it is, your complaint says it is, right? Because your complaint says that the overbroad definition of arriving alien in the regulation means that any paroled individual may be subject to expedited removal at any time, regardless of the fact that they were unlawfully paroled. So I think it then collapses back into the question of whether this regulation is a valid interpretation of the statute. Because if it is, and the regulation by its terms says, doesn't matter when, as long as you've been paroled in, you're subject to expedited removal. Yes, it does go back to that with respect to the arriving in provision. It's also our position, of course, with the designation provision that if you have been paroled, you should not be subject to expedited removal pursuant to a designation made under the designation provision. But the point is, the government certainly has taken the position that it's both and. Our position is neither. Neither is more. You have to be right on that, right? You have to be right on that it can't be either. Now, with respect to the designation one, then if the arriving doesn't work for the government, then you still have some benefit because then anyone who's here for longer than two years isn't subject, even by the government's own argument, to the designation authority. So, that doesn't sound like practically that would give you that much, but in terms of getting whole, getting relief for you, it's not enough to win just under one or the other. You'd have to win under both, right? We would like to win under both, and we think we should. And you need to, because conversely, if the government can win, at least it's the arriving one, if they can win as to the arriving one, then they don't need the designation one. This is correct. Unless somebody, the only scenario I could conceive of was along the lines of some of the questions that Judge Walker was asking, which is if there's somebody as to whom parole has been terminated, and they're here for longer than two years, and you think that the arriving authority doesn't apply to someone whose parole has been terminated, as opposed to someone who's still parole, then it could be that there's relief available for that subpopulation. Yes, but I would like to point out that this position that the government articulated today, that the arriving provision doesn't apply to someone whose parole has been terminated, I think is new. I thought they were taking the position per the language of the regulation. Even if parole has been terminated, the arriving authority continues to apply. Yes, if that is their position, yes. It doesn't matter, as long as you are a parolee, essentially. It's our understanding from the government's briefing that you are subject to the arriving in provision sort of indefinitely. That's it.  Arriving, I mean, I don't know. Not just indefinitely, but even if your parole has been terminated. Yes, this is correct. And I think that the plain terms of the regulation just say that. It says an arriving alien remains an arriving alien, even if paroled, and even after any such parole is terminated. Right. The point, the effect is, I mean, I guess this gets a little bit to the merits and sort of what was Congress trying to effectuate with these statutes. But the point of the arriving in provision was that Congress was trying to address people who were coming to the port of entry, well, coming to the United States without proper documentation. And it's our position that parolees shouldn't be encompassed in that population. I can go into our arguments as to why. But then the designation provision shows there would be no reason for Congress to try to exempt parolees from designations that the Secretary of Homeland Security could make if forever they were subject to expedited removal under the arriving in provision. Like, the structure of the expedited removal authority and the two populations that it's trying to articulate that are subject to expedited removal just don't make sense if you accept the government's position here. So the government's position, I take it, for the regulation applies to a subclass of the parolees. It's those who get parole at a port of entry? Yes, I believe so. And that's what's at issue. That's not everybody who gets parole, right? I'm not wrong about that. But what is at issue in our cases? Individuals who have been inspected and paroled at a port of entry, yes. And can I ask you one question arising from some of the questions that arose in the earlier part with government counsel, which is we have to do the inquiry for ourselves. So it doesn't matter at the end of the day. But you haven't taken the position, as I recall, that because the government says it has independent authority to effect expedited removal under the regulation, regardless of the directives, that the government doesn't have standing to appeal. Yeah, this is an interesting question. I mean, as you know, the parties didn't really brief this. I mean, we don't contest the appealability of this matter. And we still have jurisdiction questions that we have to do the assessment ourselves. And I just wanted to make sure that I didn't miss something that you hadn't raised up. No, we certainly didn't. We haven't contested the appealability of the district court stay here. I'm sure my colleagues don't have questions. Have you identified anyone who's a member who is no longer on parole and has been here for longer than three years? Sorry, longer than two years. I don't think so. But I did want to address one thing that your Honor mentioned, Judge Walker, about you said that sort of the case law and the precedent indicates that individuals who are paroled are forever on the threshold of entry. They have not entered, and they're always arriving. And I would submit that we think that that's not correct. I mean, if you'd like me to address it, I think you seem to get my argument. But I didn't want to let that go without... I noticed it in your brief, Andy. You don't think that. And I think the topic you're talking about is someone who is still on parole and has been for any amount of time. You know, you don't think that is an arriving agent. Right. They are not. They have completed their process of arriving. They are not arriving. Everything was clear. Okay. I do have one last question on something that was flagged in the earlier topic, which is, and this, I think if it goes to a legal issue, it goes to arbitrary capriciousness. But this is about the sentence in the middle column of the relevant page of the CH and D. Yes. Yes, I know what you're talking about. So there's this sentence that we were focused on, which is, if DHS were to allow the parolee to remain for the full duration, DHS would be compelled to place a grader. And that does seem problematic. And I think the Government Council acknowledges that that doesn't actually work at the end of the day.  And was your arbitrary and capriciousness argument, did it go to that sentence? Or was it, I understood it to be mainly about the previous sentence that had to do with somebody being present for at least the two years. I can go back and look at exactly what we argued in our briefing. But I think the point is that there is this inconsistency, this unexplained inconsistency, including in the language about the government being compelled. And there's no explanation for it. And I think that what Judge Walker's called for, yes, it's correct that reliance interests weren't considered. But even beyond that, the agency has still looked, sorry, the agency still has to engage in reasoned decision-making and explain the rationale for just making the decisions that it did. And that's not present here, well, in this document or any of the documents for, again, the notion that there is no time limit to apply expedited removal to parolees. But then here, the government would be compelled to terminate individuals' grants of parole before the two years so that they can subject them to expedited removal. And there's just—there's no explanation for that. Everything that they're offering in their briefing, I would submit, is post hoc justification. It's not present in the document. Yes, if they would have said, for purposes of the designation authority, we'd be compelled, that would be fine. Yes, I suppose so, but that's not what the document says. I didn't say that. The question is whether that's what was the kind of background understanding. But it doesn't say that. And I think Governing Council, for lack of acknowledging, doesn't say that. Right. If they would only talk about the designation authority, then they could mean compelled as to the designation authority, as opposed to compelled writ large. Yes, that is one way to harmonize what's going on here. But, again, that's not in the document. Let me make sure my colleagues don't have additional questions. Thank you, Council. Thank you. Mr. Becker, we'll give you the two minutes you asked for for rebuttal. Thank you very much, Your Honor. Just a couple of things. First of all, I think that plaintiffs admitted that there's really nobody that they have identified who wouldn't have been subject to expedited removal as a result of the stay than if there was no stay. And here I also want to clarify the government's position on MMD and whether there would be review in this context. I think that under this—and the government believes under this court's precedent that if there was the issue that Judge Walker was referring to, whether there was a plainly unconstitutional directive that was simply applying a plainly unconstitutional regulation, that in this context, Congress has made the decision that there just isn't judicial review available for that regulation. I think that the issue—like, after the 60 days—I think the issue here is that an organization you would have thought might have challenged that regulation at the time. If that was the case, they would have had 60 days to do so. And even if you can assume that, I think there's other situations where a court creates a certain order and there's just no ability to challenge it later, and that applies to the Constitution incorrectly. So you're walking back here, saying that there would be an ultraviarious challenge possible in the application? Yes, Your Honor. I think that under this court's precedent, MMD, I think that there's just not really a—there's just not an ability to challenge this in this context. You may disagree with that, but I do think that under this court's precedent, that is—the availability to review things in this particular context among the immigration provisions that are cited in 1252e3b is limited, and review of expedited removal generally is limited. Congress—and this court has recognized, going back to the original challenge to the expedited removal statute, that review is just very limited. And even if that review may be—that lack of judicial review may be unfair. As to the district court proceedings, I think right now the plaintiffs have—the plaintiffs said for months they were going to file a partial summary judgment motion. They recently did so a couple of weeks ago. We've moved to stay in consideration of that at this time. Their motion focuses predominantly on the arriving alien regulation, although I think—although it seems to incorporate their prior briefing on the designation provision, so I'm not exactly sure what that decision is going to be about. But that's going to be—that's what's going on in district court currently. I don't think there's—I think the government has at least an extension through April 16th on any sort of briefing in that case. I have one question before we call it a day for this argument. So the questions come up for addressability and reparable injury purposes. Suppose that there is 100 percent likelihood that expedited removal will be applied to a plaintiff if the directives are in place, but it's a 1 percent possibility if the regulation is all that there is. Which is to say there's still the possibility. It's just quite limited, but there's a certainty with the directives in place. Is your—I did not understand you to be taking the position that if that were the state of affairs—and put aside whether it's the plaintiff's burden to show that's the state of affairs, whether there's evidence from which one could reach that conclusion. I'm just assuming all that away for now. I'm just asking the question as a legal proposition. If that were the state of play, I did not understand you to be taking the position, but correct me if I'm wrong, that in that situation there's no redressability and no reparable injury because of the possibility. That still could be the correct legal proposition, but I didn't understand you to be taking that position. But am I wrong? Your Honor, if the regulation—on that particular position, I think the government would say that the plaintiffs have presented no evidence that that's the case here, that it would be such a large discrepancy. And number two, I don't think that this court's case law really talks about the difference between that delta as mattering here. I mean, I think that's evident from the Dock Society case as well as some of those third-party cases where—but I think there is some loose language in those cases saying that, you know, it might matter if there was more evidence as to— No, but put aside, yeah, I was asking for the legal proposition, which is I understood your argument to be that the plaintiffs haven't shown that there would be a difference in the practical likelihood that expedited removal will be applied. But I might be wrong about what I understood your position to be. Is your position that it doesn't matter if there would actually be a practical difference? As long as there's a legal possibility that expedited removal could be applied based on the regulation alone, no matter how small that possibility is, that's enough to mean there's no redressability and no— Your Honor, I appreciate that. I think that our position is actually both. I think it is the second that, as a legal matter, on the redressability context, if plaintiffs—if a plaintiff does not—it challenges the guidance document, it doesn't challenge underlying regulations, that there is simply no redressability. Even if the plaintiffs showed undisputedly that there's a 100 percent likelihood with the directives, there's a 1 percent likelihood with the regulation alone, and you don't contest that? Yes, Your Honor, because I think this gets to the enforcement discretion issue. So in the document here, as the designation provision, I think you have a document that's saying, you know, we should apply expedited removal pretty much all the time to these folks that qualify. And then in the February 18th email, the plaintiffs conclude it includes language that expedited removal may be applied to arriving aliens. So I think that whether the government is going to exercise its discretion in any individual—determine any individual situation, which I think what plaintiffs would have to show in one manner or the other, I think would not be shown by that. So you think even if that evidentiary showing were made, the one that I hypothesized, as a matter of law, that still wouldn't be enough because there's some possibility that a particular person could be subject to the expedited removal per the regulation? Yes, Your Honor, and I think in an associational standing challenge, it would be very difficult to assume that—to find, you know, one member and whether the government, an entirely separate actor, would actually decide to exercise their enforcement discretion one way or the other. To be able to predict that as a court, I think that would be an entirely speculative exercise. Okay. So imagine that it's not this case. It's a case where a court can issue an injunction, and the government is arresting 100 people a day and has been for months. And the court issues an injunction that enjoins every law enforcement officer except one. So the chance that the government continues to arrest someone is still less than 1% by people who would be arrested if all law enforcement officers were not enjoined. Your Honor, I think— Is your position the government wouldn't suffer an injury? Like, let's say on the winter factors, there would not be irreparable injury to the government there? Your Honor, I think there would be an irreparable injury to the government there, and the reason—the thing I think that this argument is a little difficult on is that we have—there's the factual issue that there would just be less enforcement officers or less ability to do it. And then there's the legal issue, whether there is these legal documents or, like, regulations that allow the government to exercise enforcement discretion to do something or the other. And I think that on the case of whether—if all officers besides one were enjoined from acting, then in that case, that seems like a factual issue that would suggest the government had irreparable harm because they just would functionally not be able to arrest as many people. I'll think about whether—  Go ahead. I was going to change topics. Go ahead. Imagine in 1997, the government promulgates a regulation that says expediting removal can be applied to people who have been here for three years. We're not counting—we're not talking about parolees, okay? Just take them out of the picture. People who have been here for three years. That would be an illegal regulation, right? Will you assume with me that? They expedited removal to people who were here for longer than three years? Well, the statute says two years, so I'm giving you— Oh, under the designation permission. If the arriving alien permission didn't apply, yes, that would be illegal. Yes. Yeah. We're only doing designation permission. And—but that—for whatever reason, no one challenges that for 60 days. I agree with the government. I think no one can then go to court and seek vacater of that regulation, like stark as that consequence would be. I agree with you. Here's where we disagree. I'm going to give you one more chance to tell me why I'm wrong. Imagine in 2025 the government promulgates a new regulation, and it says we are going to increase expedited removal enforcement actions for people who have been here for two and a half years. We have the authority to do it because of that 1997 regulation. And then a plaintiff files within 60 days and seeks vacater of that 2025 regulation and says this regulation is not authorized by statute, so the court should vacate it. And the government says, oh, well, it's authorized by the 1997 regulation. That would be a losing argument, right? Your Honor, I think if we're talking about two regulations, I mean, a new regulation, the new regulation may have reopened under this court's reopener doctrine. It may have reopened the old proceeding. I think you don't want to say that because then your March 25th CHND notice might have reopened their ability to challenge the 1997 regulation that actually does exist, not in a hypothetical scenario. Well, Your Honor, the reason that I was saying that was you were referring to three years versus 2.5. I mean, if you change the – if you're actually changing the regulation, that's a little bit different. Okay, well, let's say three years. I mean, in that case, it's applying the 1997 regulation. Do you think the government could promulgate a regulation in 2025 that the statute does not authorize and that no one could get it vacated within the 60-day limit? Your Honor, here, the government was simply applying its enforcement instructions. I mean, in your hypothetical, a new regulation would be challengeable within the 60-day limit. And if that new regulation is conflicted with statute, it would have to be vacated, correct? Yes, that's correct. But the question would be what – the question would be – the difference here or there would be because there actually is a new regulation. So that's challengeable within 60 days. All right. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Rao; Walker